LEROY CURRY, SR., Adm'r of the Estate of Patricia Ann Curry, Deceased, Plaintiff-Appellant, v. CHICAGO HOUSING AUTHORITY *et al.*, Defendants-Appellees.

First District (4th Division)   No. 85—1620

Opinion filed September 30, 1986.

Stephen M. Passen, Ltd., of Chicago (Stephen M. Passen, of counsel), for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Alan H. Swanson, Stephen R. Swofford, and Lynn D. Dowd, of counsel), for appellee Westinghouse Electric Corporation.

Orner, Wasserman & Moore, Ltd., of Chicago (Norton Wasserman and Esther Joy Schwartz, of counsel), for appellee Chicago Housing Authority.

PRESIDING JUSTICE LINN delivered the opinion of the court:

Plaintiff, Leroy Curry, Sr., instituted this wrongful-death action on behalf of the estate of Patricia Ann Curry. Leroy's second amended complaint alleges that the decedent died as a result of negligence on the part of the Chicago Housing Authority and the Westinghouse Electric Corporation (referred to jointly as defendants). In essence, the complaint charges that the defendants were negligent in permitting the elevators in the decedent's building to remain in disrepair and that, as a result of this negligence, the decedent was unable to receive the medical treatment she needed in a timely fashion. The complaint further claims that this delay in receiving medical treatment proximately caused the decedent's death.

The defendants immediately moved to dismiss the complaint, claiming that Curry's allegations failed to state a cause of action under Illinois law. After hearing the parties' respective arguments, the trial court agreed with the defendants and dismissed Curry's complaint, finding that the defendants owed no duty to provide continuous elevator service.

Curry now brings this appeal. Curry contends that his complaint states a valid cause of action in that: (1) the defendants, by undertaking to provide elevator service, owed a duty of ordinary care to maintain the elevators in good working condition; (2) policy considerations require the imposition of a duty on the defendants to maintain the elevators in good working condition; and (3) the defendants owed a

duty to maintain the elevators in good working condition as a result of certain statutes and regulations.

We affirm.

BACKGROUND

This case follows the trial court's decision to grant the defendants' motion to dismiss. Accordingly, we must accept as true all of the well-pleaded allegations set forth in Curry's complaint and must draw all reasonable inferences in his favor. *Cook v. Askew* (1975), 34 Ill. App. 3d 1055, 341 N.E.2d 13.

Curry's complaint reveals that the plaintiff's decedent was a seventh-floor resident of a building owned, operated, and serviced by the defendants. The building had a single elevator. Prior to March 27, 1983, the elevator became inoperable. The elevator remained inoperable "for a long period of time."

On March 27, 1983, Patricia Curry became ill and Chicago fire department paramedics were called to her aid. Because the elevator was inoperable, the paramedics had to walk up seven flights of stairs to reach Patricia's apartment. After reaching her apartment, the paramedics were then forced (because of the inoperative elevator) to carry Patricia down the seven flights of stairs. Curry alleges that a three-hour time delay was caused by the paramedics' journey up and down the seven flights of stairs. This three-hour delay, in turn, caused Patricia's physical condition to worsen and ultimately led to her death.

Curry claims that the defendants knew that the elevator was inoperable but nevertheless failed to repair it. Curry further claims that the defendants knew or should have known that persons such as Patricia Curry were living on the premises, were physically incapable of using the stairs to enter or exit the building, and were, therefore, dependent on the elevator to function properly as it was their only safe means of getting from their apartments to the outside world.

In addition, Curry asserts that the defendants, in failing to maintain the elevators in good working condition, were negligent in that they violated numerous statutes and ordinances, to wit: (1) Sections 2 and 3 of the Housing Authorities Act (Ill. Rev. Stat. 1983, ch. 67½, pars. 2, 3) (which provides that one of the purposes of the Chicago Housing Authority is to provide safe dwellings for its tenants); (2) Sections 2 and 7 of "An Act in relation to the installation of elevators in buildings" (Ill. Rev. Stat. 1983, ch. 111½, pars. 4002, 4007) (which require elevators to be available for emergency use); (3) Section 3—102 of the Local Governmental and Governmental Employees Tort

Immunity Act (Ill. Rev. Stat. 1983, ch. 85, par. 3—102) (which states that a local public entity has a duty to maintain its property in reasonably safe condition); and (4) the Municipal Code of the City of Chicago, chapters 46—11, 46—12, and 46—13 (1984) (which requires elevator inspections). Curry claims that these statutes and ordinances impose a duty on the defendants and that the defendants' failure to comply with these statutes and ordinances proximately resulted in Patricia's death.

Following the trial court's dismissal of Curry's complaint, he filed this appeal. As stated previously, Curry claims that the trial court erred in: (1) failing to find that the defendants owed Patricia Curry a duty of care based on their undertaking to provide elevator service; (2) failing to find that policy considerations mandate a duty to be imposed on the defendants; and (3) failing to find that a duty was created by the statutes and ordinances set forth in her complaint.

OPINION

I

We first address Curry's claim that the defendants owed her a duty of care based on their undertaking to provide elevator service. Curry asserts that this duty of care includes a responsibility on the defendants' part to repair an elevator within a reasonable period of time. We disagree.

■ In *Champs v. Chicago Housing Authority* (1986), 141 Ill. App. 3d 881, the court addressed a complaint containing the same allegations as that in the case at bar. In *Champs*, the plaintiff alleged that she suffered a miscarriage as a result of having to walk down 14 flights of stairs due to the inoperable condition of the building's elevators. The trial court dismissed her action. On appeal, the *Champs* court refused to find that the owner of an apartment building assumes the duty to guarantee the elevator's continuous operation merely because that owner has chosen to provide his tenants with an elevator. The *Champs* court surmised its view by stating:

> "To avoid liability, defendants would have to provide near continuous elevator service and repair elevators immediately upon notice of breakdown, regardless of whether the break in service is due to unavailability of spare parts, vandalism or mere mechanical failure. The consequence of such a duty would be that defendants would either have to increase greatly the monitoring and servicing of the elevators (which would be undue economic burden on the defendants) or provide no elevator service

at all." 141 Ill. App. 3d 881, 883-84.

We agree with this position and adopt the reasoning of the *Champs* court in full. This is not a case wherein an elevator malfunctioned thereby causing injury to the plaintiff (see, *e.g.*, *Lewis v. Westinghouse Electric Corp.* (1985), 139 Ill. App. 3d 634); instead, this is a case where the elevator simply did not operate. That elevators break down and must remain inoperable pending repair is a fact of life. That being the case, we, like the *Champs* court, refuse to hold that a defendant landowner has a duty to guarantee the continuous operation of the elevators housed in its buildings.

## II

We also believe that our ruling today comports with sound policy considerations. As Curry correctly points out, public policy and social requirements are considerations in determining whether a certain duty exists. (*Salvi v. Montgomery Ward & Co.* (1986), 140 Ill. App. 3d 896.) In the present case, it is our view that while an inoperable elevator may cause some discomfort, it is, nonetheless, not the type of circumstance in which public policy would be furthered through the imposition of tort liability, especially where the very reason that the elevator fails to operate may actually be in society's best interests (*e.g.*, the elevator is shut down for periodic repairs or inspections). Thus, at least with regard to the facts before us, we believe that sound policy considerations dictate that no liability be imposed on the defendant in the present case.

## III

■ The last issue raised by Curry concerns the defendants' alleged breach of several Illinois statutes and Chicago city ordinances. Curry relies on the following statutes and ordinances for establishing a duty on the defendants to ensure that the elevator in its building was operating continuously:

"*Ill. Rev. Stat.*, 1983, Ch. 85, Sec. 3—102(a), provides as follows:

(a) Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended or permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of such a condition

that is not reasonably safe in sufficient time prior to an injury to have taken measures to remedy or protect against such condition.

*Ill. Rev. Stat.*, Ch. 67½, Sec. 2, provides, in pertinent part, as follows:

Sec. 2: It is hereby declared as a matter of legislative determination that in order to promote and protect the health, safety, morals, and welfare of the public, it is necessary in the public interest to provide for the creation of municipal corporations to be known as housing authorities, and to confer upon and vest in said housing authorities all powers necessary or appropriate in order that they may engage in low-rent housing and slum clearance projects, and undertake such land assembly, clearance, rehabilitation, development, and redevelopment projects as will tend to relieve the shortage of decent, safe, and sanitary dwellings.

*Ill. Rev. Stat.*, Ch. 67½, Sec. 3, provides, in pertinent part, as follows:

Sec. 3: The Department shall thereupon issue a certificate to the presiding officer of such city, village, incorporated town or county for the creation of such authority if it shall find (a) that unsanitary or unsafe inhabited dwelling accommodations exist in such city, village, incorporated town or county, or (b) that there is a shortage of safe or sanitary dwelling accommodations in such city, village, incorporated town or county available to persons who lack the amount of income which is necessary (as determined by said Department) to enable them without financial assistance to live in decent, safe, and sanitary dwellings without overcrowding.

Chapter 46—11 of the Municipal Code of the City of Chicago provides as follows:

Every elevator, movable stage, movable orchestra floor, platform, lift, dumbwaiter, or escalator now in operation, or which may hereafter be installed, together with the hoistway and all equipment thereof, shall be inspected under and by the authority of the Commissioner of Inspectional Services at least once every six months, and in no case shall any new equipment be placed in operation until all [*sic*] inspection of the same has been made. It shall be the duty of every owner, agent, lessee, or occupant of any building wherein any such equipment is installed, and of the person in charge or control of any such equipment to permit the making of a test and

inspection of such elevator, dumbwaiter, or escalator, and all devices used in connection therewith upon demand being made by the Commissioner of Inspectional Services or by his authorized elevator inspector within five days after such demand has been made.

Chapter 46—12 of the Municipal Code of the City of Chicago provides:

Wherever [sic] any elevator, movable stage, movable orchestra floor, platform, lift, dumbwaiter, or escalator has been inspected and [the] tests herein required, shall have been made of all safety devices with which such equipment is required to be equipped and the result of such inspection and tests show such equipment to be in good condition, and that such safety devices are in good working condition and in good repair, it shall be the duty of the Commissioner of Inspectional Services to issue or cause to be issued a certificate setting forth the result of such inspection and tests and containing the date of inspection, the weight which such equipment will safely carry, and a statement to the effect that the shaft doors, hoistway, and all equipment including safety devices comply with all applicable provisions of Chapter 79 of this code, upon the payment of the inspection fee required by the provisions of this code. It shall be the joint and several duty of the owner, agent, lessee, or occupant of the building in which such equipment is located and of each person in charge or control of such equipment to frame the certificate and place the same in a conspicuous place in each elevator and near each dumbwaiter, movable stage, movable [orchestra] floor, platform, lift, or escalator. The words 'safe condition' in this section shall mean that it is safe for any load up to the approved weight named in such certificate.

Chapter 46—13 of the Municipal Code of the City of Chicago states:

Where the result of such inspection or tests shall show that such elevator, movable stage, movable orchestra floor, platform, lift, dumbwaiter, or escalator is in an unsafe condition or in bad repair, or shall show that any of the safety devices which are required by the provisions of Chapter 79 of this code, have not been installed or, if installed, are not in good working order or not in good repair, such certificate shall not be issued until such elevator, its hoistway, and its equipment, or such dumbwaiter, movable stage, movable or-

chestra floor, platform, lift, or escalator, or such device or devices have been put in good working order.

*Ill. Rev. Stat.*, Ch. 111½, Section 4007, states:

4007: *Firemen's Emergency Service* Every group of elevators in a building subject to the provisions of this section shall be available for firemen's emergency service. In buildings where there are several groups of elevators and where individual key switches are provided to cause cars to return to the main floor, this arrangement is satisfactory, provided that a separate key box is provided for each group of elevators."

We do not read any of the statutes or ordinances set forth above as establishing the duty suggested by Curry. Section 3—102(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1983, ch. 85, par. 3—102(a)) is inapplicable to the present case in light of the fact that no unsafe condition existed merely because the elevator was inoperable. Section 2 of the Housing Authorities Act (Ill. Rev. Stat. 1983, ch. 67½, par. 2) is inapplicable for the same exact reason. Moreover, chapter 46—11 of the Municipal Code of Chicago is nothing more than a directory statute regarding what qualifications must be met in order for an elevator to pass inspection by State officials. The Chicago Municipal Code sections set forth above are limited to inspectional services. And, finally, section 7 of "An Act in relation to the installation of elevators in buildings" (Ill. Rev. Stat. 1983, ch. 111½, par. 4007) is inapplicable for it seeks to protect a class of persons not involved in the present case, namely, firemen.

In addition, Curry has not provided, nor has our independent research disclosed, any case law construing the statutes and municipal code sections set forth above in such a way that a resultant duty upon landowners has been created. Thus, we are confident that our interpretation of the statutes and ordinances, including their purposes and the persons thereby protected, is correct.

In sum, we agree with the trial court that Curry's complaint fails to state a cause of action under Illinois law. Accordingly, for the reasons set forth above, the decision of the circuit court of Cook County is affirmed.

Affirmed.

JIGANTI and McMORROW, JJ., concur.